**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **PHYLLIS CUMMERLANDER,** *et al.,* | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **Case No. 2:13-CV-0329** |
| **v.** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **PATRIOT PREPARATORY ACADEMY** | : | |
| **INC.,** *et al.,* | : | **Magistrate Judge Kemp** |
| | : | |
| **Defendants.** | : | |

## OPINION & ORDER

This matter comes before the Court on Motion of Defendants Patriot Preparatory Academy ("Academy"), Sean Smith, Charles Kabealo, Pamela Gould, H. David McIIrath, and C.P., a minor by and through his natural and custodial parent, Christian Penn, Sr. (collectively "Plaintiffs") for Summary Judgment on all counts in Plaintiffs' complaint. Plaintiffs Phyllis Cummerlander and J.T. Cummerlander ("JT") (collectively "Plaintiffs") bring this suit under 42 U.S.C. §1983, alleging the Academy, severally or jointly with Defendants, violated JT's Fourth Amendment right by subjecting him to a urinalysis drug screening under threat of expulsion on April 20, 2012, and civil conspiracy related to the alleged violation of JT's Fourth Amendment right. Plaintiffs also allege the state law claims of interference with and/or destruction of evidence, defamation, civil conspiracy brought under 42 U.S.C. §1983, loss of filial consortium, and punitive damages. For the reasons set forth herein, Defendants' motion is **DENIED** in part, and **GRANTED** in part.

### I.    BACKGROUND

#### A.    *Factual Background*

1

This civil rights and tort action arises from a urinalysis drug screening of an Academy Student, JT, conducted under the discretion of Academy's Principal, Sean Smith, on April 20, 2012. Academy is an Ohio Community School, otherwise known as a charter school, established under R.C. Chapter 3314, which serves approximately 585 students in grades K-12. As a community school, Academy operates independently of any school district and under contract with an authorized sponsoring entity that is established by statute or approved by the State Board of Education. Any student eligible to attend public school in the State of Ohio is eligible to attend a community school.

Plaintiff JT enrolled in the eighth grade at Defendant Academy in 2012. JT's school day began in his homeroom, taught by Mr. Kabealo. At the Academy, the school day always began with a 5-10 minute homeroom, in which students from the same grade gathered to receive announcements and the homeroom teacher took attendance. Students were generally free to interact with each other during homeroom.

The written policy concerning drug testing in the Academy's student handbook, which Cummerlander signed, states:

> Expulsion: A student may be expelled because of excessive detention penalties or for other serious problems. For example, a student may be expelled if involved in the following, at or away from school, year round . . . Drug Testing: the school has the right to demand a drug test (at the parent's expense) if rumors are circulating about a particular student. The refusal to submit to a drug test at the request of the administration automatically results in the student's removal from the school.

## 1.   Kabealo's Homeroom on April 20, 2012

On the morning of April 20, 2012, Defendant Kabealo allegedly heard students in his homeroom discussing the fact that it was national marijuana day. Kabealo states that during this discussion, Plaintiff JT entered the class, and Defendant Kabealo heard JT state that he had

"smoked one this morning." Kabealo further alleges that he heard another student, CP, respond, "really?" Kabealo states that he then observed JT nod affirmatively and sit down. Kabealo attests that nothing in the interchange caused him to conclude that the conversation was in jest.

Defendants allege that homeroom ended, and JT went to his first period class. Kabealo, trained in the philosophy of "see something, say something," reported to Smith what he allegedly had heard JT say. Smith asked Kabealo whether he thought JT was joking, to which Kabealo responded, "no." Smith told Kabealo that he would look into the matter, and Defendants state that Kabealo had no further involvement in the matter, nor did he ever discuss the matter again with JT. Smith does not state that he asked Kabealo any other questions during that exchange.

After speaking with Kabealo concerning JT's alleged statement, Smith then spoke to the student, CP. Smith states CP confirmed Kabealo's version of events. CP's first set of interrogatories, dated March 22, 2014, corroborate that CP told Smith that he had heard JT state that JT had smoked marijuana that morning. (Doc. 84-5 at 2). Defendant Smith does not state that he asked CP any questions except whether he had heard JT's particular statement. Smith did not speak to any other students who may have been sitting with or near JT concerning JT's alleged statement, nor did he perform any further investigation. Plaintiffs allege that CP told Mr. Smith that he did not hear JT say "I smoked one this morning."

JT has a different version of the events. JT states that on the morning of April 20, 2012, he walked into Kabealo's homeroom and everyone was seated already. (Doc. 84, Attachment 4 at 17). He sat down at his seat in the back of the classroom near a student named Tayvion. *Id.* JT observed that the other part of the class was talking about "something like marijuana" near the front of the class. Kabealo was sitting in front of the class. *Id.* at 17-18.  JT states that he was not discussing marijuana, but boxing, with Tayvion. While JT was discussing boxing with Tayvion,

JT states that another student named Nicholas asked him if he knew that it was marijuana day. JT responded, "I don't know. Marijuana is not a part of my life so I don't recall – I don't care for that." *Id.* at 18. The other students around him proceeded to discuss marijuana day. *Id.* Cummerlander states in an affidavit that she had a telephone conversation with CP on July 29, 2013, and that CP stated in that conversation that: (1) he did not hear JT state that he had smoked marijuana on April 20, 2012; (2) Smith was present in the Kabealo homeroom on April 20, 2012; and (3) when asked by Smith in his office on April 20, 2012 whether JT smoked and/or possessed marijuana, he said no to each of these questions. (Doc. 89-2). In CP's December 9, 2013 deposition, however, he stated that he did not remember anything concerning the April 20, 2012 incident. (Doc. 84-1).

JT states that Smith entered the homeroom while it was still in session, and that Smith had a verbal exchange with Kabealo, and remained there when homeroom period ended and JT went to his first period class. JT states that after being in his first period for 15 minutes, Defendant Smith retrieved him from class.

## 2.      Smith's Office

In his office, Smith shared with JT the information he had allegedly received from Kabealo concerning JT's statement that he had smoked marijuana that morning, as well as CP's alleged corroboration of Kabealo's version of the events. Smith gave JT an opportunity to respond, and JT denied making the statement that he had "smoked one this morning." According to JT, Smith then said "why don't you prove it, then." JT asked why he would have to prove it, to which Smith stated that if he did not take the test, he would not be able to return to the Academy. At that point, JT acquiesced to the test. Smith states that he made the decision to test JT pursuant to the Academy drug testing policy. Smith states also that by his judgment, CP had no malice or

reason to make something up about JT, and Kabealo is a staff member whom he trusts, so he determined that he trusted JT's denial less than the statements made by CP or JT. Smith states that he did not consider JT's demeanor when making the decision to test JT. He further states that nothing in JT's behavior or appearance was out of the ordinary; his decision to test JT for marijuana rested entirely on the statements Kabealo and CP made to him. Neither Gould nor Kabealo state they observed any signs that JT was under the influence of marijuana. Smith also states that he did not think JT had any history of substance abuse.

After JT acquiesced to the test, Smith called Cummerlander and informed her that her son had been accused of smoking marijuana, that he had acquiesced to a drug test, and requested her permission to drug test him. According to Cummerlander's deposition, she denied that JT smoked marijuana, and provided her consent, but stated that she would have JT retested regardless of any results.

Gould and Smith directed JT to a private bathroom to urinate in a cup. Gould prepared the urinalysis drug test, and it sat for some time on a shelf until it was ready. Gould and Smith reviewed the directions included in the drug test kit, and told JT that two bars would mean the test was clean, and one bar would mean he tested positive for marijuana. When the test was ready, Gould and Smith read the results and determined that two bars had shown up, but that one of them was more distinct than the other. They determined, therefore, that the test "appeared" positive for marijuana. Gould recorded her observations in a memorandum, and did not take any other actions regarding the matter.

In light of what Smith and Gould determined was a positive screen, Smith called Cummerlander to retrieve JT from the Academy. Smith communicated in a letter that JT could not return to school unless Academy received a "clean" drug screening for JT, and gave this

letter to Cummerlander when she arrived. Cummerlander looked at the test results and states that she saw two lines. JT saw two lines as well. Cummerlander attempted to take the test with her, but Smith took it back from her. On Monday April 23, 2013, JT received a drug test that showed he tested negative for marijuana, and Plaintiffs advised Smith of the test results. JT returned to the Academy on Tuesday April 24, 2012.

### 3.     <u>Return to School on April 24, 2012</u>

JT states that when he returned to school, CP, in the presence of three or four other Academy students, said to JT that Smith had told him that JT was expelled for smoking marijuana. In Cummerlander's affidavit she states that she spoke to CP on the phone on July 29, 2013, and CP stated that on April 24, 2012, Defendant Smith told CP that JT was suspended from the Academy because JT smoked marijuana.

In his interrogatory responses, CP states that he heard JT had been suspended for smoking marijuana from a friend whom JT had texted and told he had been suspended for smoking marijuana. Defendants Kabealo and Smith, as well as one of JT's other teachers, Briggs, state that JT appeared unfazed by the incident upon his return, and acted normally with Kabealo.

### 4.     <u>Injury</u>

Plaintiffs state that the false accusation, two drug tests, the false reading of the initial drug test, the disruption of JT's educational experience, the publication of the expulsion of JT for smoking marijuana and the Academy's refusal to delete the accusation from JT's record for some time caused Cummerlander and JT distress and anxiety. They also state that they received and continue to receive professional assistance in dealing with this anxiety and distress.

### B.  Procedural Background

Plaintiffs filed this action on April 8, 2013. (Doc. 1). On November 15, 2013, Plaintiffs amended the complaint to assert the following claims against Defendants: (I) a 42 U.S.C. 1983 claim for a Fourth Amendment Violation; (II) Interference with and/or Destruction of Evidence; (III) Defamation; (IV)  42 U.S.C. 1983 claim for Civil Conspiracy; (V) Negligent Misidentification; (VI) Filial Consortium; (VII) Punitive Damages. (Doc. 30).

Defendants filed their Motion for Summary Judgment on all of Plaintiffs' claims on September 8, 2014. (Doc. 83). This matter has been fully briefed and is therefore ripe for review.

### II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides, in relevant part, that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law."  *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson,* 477 U.S. at 251-52).  In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party.  *United States S.E.C. v. Sierra Brokerage Servs., Inc.,* 712 F.3d 321, 327 (6th Cir. 2013).  The court reviewing a summary judgment motion need not search the record in an effort to establish the lack of genuinely disputed material facts,

however. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404 (6th Cir.1992). Rather, the burden is on the nonmoving party to present affirmative evidence to defeat a properly supported motion, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989), and to designate specific facts that are in dispute. *Anderson*, 477 U.S. at 250; *Guarino*, 980 F.2d at 404–05.

To survive the motion the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339-40 (6th Cir. 1993). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson,* 477 U.S. at 251; *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir. 1995); *see also Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992) (finding that the suggestion of a mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment) (citing *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir. 1986)).

### III. ANALYSIS

#### A. 42 U.S.C § 1983, Fourth Amendment Claims

Defendants argue that they are entitled to summary judgment on Plaintiffs' claim that the April 20, 2012 search of JT was a violation of JT's Fourth Amendment rights. First, Defendants argue that JT and his mother provided their verbal consent for the urinalysis, which is an exception to the reasonable suspicion requirement. Second, Defendants argue that, even if the Court does not conclude that JT and Cummerlander consented to the urinalysis, Defendants sued in both their individual and official capacities are entitled to qualified immunity for any potential violation of JT's Fourth Amendment rights.

Plaintiffs retort that the verbal consent to JT's drug test is better characterized as acquiescence, as it was forced under the threat of JT's expulsion. Further, they argue that Defendants are not entitled to qualified immunity because the search of JT was not based on reasonable suspicion, and was made pursuant to an unconstitutional school policy that calls for mandatory drug testing under risk of expulsion if there is a rumor that a student has used drugs.

The Court will address the question of consent as a threshold issue before reaching the question of qualified immunity.

### 1.    Whether Plaintiffs Consented to a Urinalysis

Plaintiffs do not contend that they did not provide verbal permission to Defendant Smith to drug test JT. Instead, they argue that their verbal acquiescence to the urinalysis was not voluntary, but coerced, because it was demanded under threat of JT's expulsion. There is no dispute that Defendant Academy has a school policy that provides that if rumors are circulating about a particular student regarding drug use, he or she will be drug tested, and the refusal to submit to a drug test at the request of the administration automatically results in expulsion. Nor is there a dispute that Cummerlander signed the student handbook containing the drug testing policy. Smith's deposition confirms that he made the decision to drug test JT pursuant to this policy.

 The Fourth Amendment of the United States Constitution provides, in part, "[t]he right of people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. When a search is "conducted pursuant to consent," however, the court need not reach the question of whether the search was reasonable, as long as consent was given both freely and voluntarily. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Consent must be proved by clear and positive testimony and must

be unequivocal, specific, and intelligently given, uncontaminated by any duress and coercion. *United States v. Williams,* 754 F.2d 672, 674–75 (6th Cir.1985). Consent must not be coerced, by explicit or implicit means, by implied threat, or covert force. *Schneckloth,* 412 U.S. at 228, 93 S.Ct. 2041. When conducting this analysis, account must also be taken for the potentially vulnerable subjective state of the searched person. *Id.* at 229.

In *Tarter v. Raybuck*, 742 F.2d 977 (6th Cir. 1984), the Court considered whether a student voluntarily consented to a Fourth Amendment search by school officials, where school officials searched the student after he had been observed smoking and exchanging money and plastic bags believed to be marijuana. *Id.* at 979. First, the school officials asked him to remove his jacket and searched his outer clothing. *Id.* Then, they requested the student remove his pants, but the student refused. *Id.* at 980. The district court concluded that the student consented to the search, but the appellate court was not "convinced" that the student "knowingly and intelligently waived his constitutional rights when he 'consented' to be searched," and chose to resolve the case on other grounds. *Id.* at 980. The *Tartar* Court held that

> [t]he burden would be upon defendants to demonstrate such a voluntary relinquishment of constitutional rights by plaintiff. There is a presumption against the waiver of constitutional rights. That he may have acquiesced in the initial search does not necessarily demonstrate the relinquishment of his rights to challenge his initial search. In fact, David Tarter's testimony indicates he only submitted to the search because he was afraid. Furthermore, there is no indication he even was aware that he might have had a constitutional right to object to a search. His eventual refusal to be strip-searched fully is not necessarily an indication of a waiver of his rights, rather it is equally likely that personal modesty or embarrassment resulted in his ultimate refusal to permit the search to continue.

*Id.* at 980-81.

In the case *sub judice*, there is a similar presumption against the waiver of JT's constitutional rights. Like the student in *Tarter*, JT and his mother clearly were fearful that JT

would be expelled if he did not acquiesce to the search. Smith directly threatened JT with expulsion, though it does not appear Smith directly brought up the school expulsion policy during his phone conversation with Cummerlander. She had, however, signed the student handbook containing the policy, and by her signature was presumed to be aware of the repercussions should she have refused. Although JT and his mother gave clearer verbal consent in the case *sub judice* than the student in *Tarter*, the clarity of their consent is irrelevant because it was coerced, nonetheless, under the threat of JT's expulsion and the fear surrounding the accusation. Further, the burden is on the Defendants to show that JT and his mother voluntarily relinquished JT's Fourth Amendment rights; Defendants present no evidence that either JT or his mother was aware that JT had a constitutional right to object to an unreasonable search.

Thus, this Court holds that Defendant Smith secured the verbal consent from JT and his mother by coercive means, because they were faced with the choice between waiving JT's constitutional right against unreasonable search and seizure and expulsion. Further, the facts do not show that JT was aware of his right to refuse an unreasonable, unconstitutional search.

The Supreme Court, the Sixth Circuit, and other Circuits have consistently held that individuals do not voluntarily waive their constitutional rights when they are presented with the stark choice by an authority figure between waiving a constitutional right and maintaining their livelihood. This line of cases supports this Court's determination that JT and his mother did not consent freely to the search. First, in the context of waiver of a constitutional right under threat of losing one's livelihood, the Supreme Court and the Sixth Circuit have held that public employees cannot be given a stark choice between asserting a constitutional right and losing their jobs. *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568 (1968) ("If a search is unreasonable, a government employer cannot require that its employees consent to that search as a condition of

employment."); *Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation of City of New York*, 392 U.S. 280, 284-85 (1968); *see also Gardner v. Broderick,* 392 U.S. 273, 279 ("the mandate of the great privilege against self-incrimination does not tolerate the attempt, regardless of its ultimate effectiveness, to coerce a waiver of the immunity it confers on penalty of the loss of employment"); *Clemente v. Vaslo*, 679 F.3d 482, 492 (6th Cir. 2012) (finding that the Sixth Circuit cases on the issue of waiving one's constitutional right under threat of employment termination falls well within clearly established law of upholding employer actions where the employees were not required to give up constitutional protections in order to keep their employment).

Similarly, the Eleventh Circuit has held that an employees' submission to mandatory, suspicionless drug testing, on pain of termination, does not constitute consent under *Schneckloth. Am. Fed'n of State, Cnty. & Mun. Employees Council 79 v. Scott*, 717 F.3d 851, 873-76 (11th Cir. 2013) *cert. denied*, 134 S. Ct. 1877, 188 L. Ed. 2d 912 (2014). The *Scott* Court called it a Hobson Choice to tell employees "either they relinquish their Fourth Amendment rights and produce a urine sample which carries the potential for termination, or they accept termination immediately." *Id.* In *Lebron v. Sec'y, Fla. Dep't of Children & Families*, the Eleventh Circuit similarly held that a welfare recipient's "mandatory 'consent' " to suspicionless drug testing in order to receive benefits was of no "constitutional significance" because it was a "'submission to authority rather than ... an understanding and intentional waiver of a constitutional right.'" 710 F.3d 1202, 1214-15 (11th Cir.2013) (quoting *Johnson,* 333 U.S. at 13, 68 S.Ct. 367).

The comparison is obvious between threatening employees or welfare recipients with loss of their livelihood unless they relinquish their constitutional rights, and threatening students with expulsion unless they relinquish their constitutional rights. Further, as stated in *Lebron*,

providing consent to a drug test due to submission to authority is of no constitutional significance. Every American youth depends on access to public school and a positive school record in order to attain future economic success. Just like government employees and welfare recipients do not voluntarily waive their constitutional rights under threat of losing their livelihood, neither did JT and his mother voluntarily consent to relinquish JT's Fourth Amendment right under threat of his expulsion.

### 2. Qualified Immunity

Now that the Court has determined it will not resolve Plaintiffs' Fourth Amendment claim on summary judgment on the grounds that they gave their consent to the search, the Court will consider next Defendants' argument that Defendants are entitled to qualified immunity.

Section 1983 of 42 U.S.C. "permits an injured person to recover in federal court against defendants who violate a plaintiff's federal statutory or constitutional rights while acting under color of state law." *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 493 (6th Cir. 2008) (citing *Neuens v. City of Columbus,* 303 F.3d 667, 670 (6th Cir.2002)). There is no dispute in this case that Academy or school officials were acting under state law at all times relevant. Defendants contend, however, that the doctrine of qualified immunity shields those Defendants sued in their individual capacities, and also those sued in their official capacities and municipal entities from liability for the alleged deprivation of JT's Fourth Amendment right.

As it pertains to individual public officials, the doctrine of qualified immunity shields government officials performing discretionary functions from civil liability insofar they can show "that they did not violate any of the plaintiff's federal statutory or constitutional rights that were 'clearly established' at the time of the alleged misconduct and of which the defendants

could reasonably be expected to have been aware." *Brannum v. Overton Cnty. Sch. Bd.,* 516 F.3d

489, 493-94 (6th Cir. 2008) (citing *Saucier v. Katz,* 533 U.S. 194, 202 (2001).

Thus, when determining whether to grant qualified immunity to an individual

government official, this Court employs a three-part test:

> *First,* we determine whether, based upon the applicable law, the facts viewed in the light
> most favorable to the plaintiffs show that a constitutional violation has occurred. *Second,*
> we consider whether the violation involved a clearly established constitutional right of
> which a reasonable person would have known. *Third,* we determine whether the plaintiff
> has offered sufficient evidence to indicate that what the official allegedly did was
> objectively unreasonable in light of the clearly established constitutional rights. If the
> answer to all three questions is yes, then qualified immunity is not proper.

*Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 602-03 (6th Cir. 2005)(citations omitted).

As the doctrine of qualified immunity pertains to officials sued in their official capacities

and municipal entities, such defendants are liable for a violation of § 1983 if the Plaintiffs show:

(1)  A deprivation of a constitutional right; and

(2) The municipal entity is responsible for that deprivation.

*Doe v. Claiborne Cnty., Tenn. By & Through Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 505-

06 (6th Cir. 1996) (citing *Collins v. City of Harker Heights,* 503 U.S. 115, 120, 112 S.Ct. 1061,

1065–66, 117 L.Ed.2d 261 (1992)). To prove that the Academy is responsible for the violation,

the Plaintiffs cannot rely on a theory of *respondeat superior*, since liability under § 1983 may not

be imposed on a governmental entity for the acts of its employees. *Id.*; *see also Monell v.*

*Department of Soc. Servs.,* 436 U.S. 658, 692 (1978). Instead, Plaintiffs must show that the

School *itself* is the wrongdoer. *Id.* The Academy cannot be found liable unless the Plaintiffs "can

establish that an officially executed policy, or the toleration of a custom within the [school] leads

to, causes, or results in the deprivation of a constitutionally protected right. *Id.* at 507 (citing

*Monell,* 436 U.S. at 690–91).  In other words, the Plaintiffs must show a "direct causal link

between the custom and the constitutional deprivation; that is, 'show that the particular injury was incurred *because* of the execution of that policy.'" *Doe v. Claiborne County,* 103 F.3d 495 (6th Cir.1996) (citation omitted).  As stated in *Doe,* it is necessary to show this "direct causal link" to "avoid *de facto respondeat superior* liability explicitly prohibited by *Monell." Id.* at 508.

As the first step in the qualified immunity analysis, this Court will address whether the drug testing of JT was an unconstitutional deprivation of his Fourth Amendment right.

### a. *Constitutional Violation of Fourth Amendment*

The constitutional jurisprudence is well-established that the Fourth Amendment applies in the public school context to protect students from unconstitutional searches conducted by school officials. *Brannum*, 516 at 494 (citing *Vernonia Sch. Dist 47J v. Acton, 515 U.S. 646, 656 (1995); New Jersey v. T.L.O.,* 469 U.S. 325, 333-34 (1985)). Specifically, "[s]earches by public school officials, such as the collection of urine samples, implicate Fourth Amendment interests." *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822 (2002). Thus, even on school property, students have legitimate expectations of privacy. *New Jersey 469* at 339. While school officials are subject to the mandates of the Fourth Amendment, however, "the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law." *Id.* at 341. In lieu of a probable cause standard, the Supreme Court has applied the standard of reasonable suspicion under all the circumstances to determine the legality of a school administrator's search of a student. *Safford Unified School Dist. No. 1 v. Redding*, 557 U.S. 364, 370 (2009) (citing *T.L.O.* at 354). The Supreme Court set forth a two-part test to determine the reasonableness of a school's search of a student: first, the

search must be justified at its inception; if it is, then the second prong requires that the search, as actually conducted, be reasonably related in scope to the circumstances justifying the search in the first place. *Id.*

Plaintiffs do not argue that the search in question was unreasonable in scope, but only in its inception. A school's search of a student is justified at its inception "when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *T.L.O.,* 469 U.S. at 342. The Supreme Court has held that when analyzing whether reasonable suspicion exits in the context of school searches, the standard can be described as "a moderate chance of finding evidence of wrongdoing." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 371. When analyzing the required knowledge element of a reasonable search, we look to the "specificity of the information received," and the "reliability of its source," but at the end of the day "these factors cannot rigidly control, as the standard takes their substantive content from the particular contexts in which they are being assessed." *Id.*

The Sixth Circuit has stated, "it is the affirmative obligation of the school authorities to investigate any charge that a student is using or possessing narcotics and to take appropriate steps if the charge is substantiated." *Tarter*, 742 F.2d at 982. Even when viewing the facts in the light most favorable to the Defendant, this Court does not find that Defendant Smith's investigation of the charges against JT substantiated those charges under the circumstances, and thus did not meet the reasonable suspicion standard. In other words, this Court finds that Kabealo's statement that he overheard JT say he had smoked marijuana, and CP's corroboration of JT's statement, without any further investigation of the circumstances, was not sufficient evidence for Smith to search JT.

This Court finds it particularly relevant that no other school official made any other finding or observation regarding whether JT had smoked marijuana that day or any day prior. Smith's rapid resort to coercing JT into a drug test to resolve the charge against him, under the pretense that JT should simply prove he had not smoked if he in fact had not, undermines the protections provided to JT and other students under the Fourth Amendment. Cases from the Supreme Court as well as the Sixth Circuit show that a search of a student for alleged drug use or possession should be based on a reasonable investigation, that includes a consideration of indicia of the student's present or past drug use, and an assessment of the reliability of the informant's statements and the student's history.

It is important to note that while the Supreme Court has upheld suspicionless drug testing for students involved in both athletic and non-athletic extracurricular activities, neither the Supreme Court nor this Circuit has never upheld suspicionless drug testing for the entire student population. *See Vernonia school Dist. 47J v. Acton*, 515 U.S. 646 (1995); *Bd. of Education of Independent School Dist. Of Pottawatomie Cnty v. Earls*, 536 U.S. 822 (2002). In *Vernonia* and *Earl*, the Court considered that students electing to participate in after-school programs were subject to a separate set of rules that do not apply to the student body as a whole, had a lower expectation of privacy due to situations of communal undress and medical examinations, and that the only consequence was to limit students' privilege to participate in the elective activity. In contrast, students in the general population are required by law to go to school and have not made voluntary tradeoffs of some of their privacy interests in exchange for a benefit or privilege. *See Doe ex rel. Doe v. Little Rock Sch. Dist.,* 380 F.3d 349, 353-54 (8th Cir. 2004) (holding unconstitutional an official school policy that stated all students' personal belongings were subject to random and periodic search at all times because school could not "deprive its students

of privacy expectations protected by the fourth amendment simply by announcing that the expectations will no longer be honored."). Thus, the constitutional standard of reasonable suspicion applies to the drug test in the case *sub judice*.

In *T.L.O.* and *Safford*, the Supreme Court found reasonable suspicion for the respective schools to search the students for drug use or possession based on investigations and indicia for drug use or distribution much more complete than are present in the case *sub judice*. First, in *T.L.O.* the Supreme Court found sufficient indicia to search a student's purse only after a teacher personally discovered the plaintiff and her companion smoking cigarettes in a school lavatory. *T.L.O.* 469 at 325. When the principal searched the student's purse for cigarettes, she found rolling papers that are commonly associated with marijuana use, and proceeded to search other compartments and found some marijuana. *Id.*

In *Safford*, the Supreme Court found reasonable suspicion to search a student's backpack and outer clothing for prescription drugs only after direct evidence showed a high likelihood that the student was in possession of contraband and prescription medication on campus, and the school corroborated, from various sources, that the student allegedly had been involved in illegal drug and alcohol related activity on campus and at home. *Safford Unified Sch. Dist. No. 1* 557 U.S. at 365. In *Safford*, a week before the search at issue, student J told the principal and assistant principal that students were bringing drugs and weapons to school and that he had gotten sick from the pills. *Id* at 371-372. On the day of the search, student J returned to the assistant principle with a similar pill he said came from student M, and that students were planning to take the pills at lunch. *Id.* at 372. When the administrators questioned student M, she was in possession of a day planner that contained various contraband items, which student M said belonged to student S. *Id.* The assistant principle searched students M's pockets and wallet,

18

and found a blue pill, several white ones, and a razor blade. *Id*. Student M stated that the blue pill came from Student S. *Id.* Student S was called into the office and she revealed she was friends with student M, and that the day planner was hers. *Id*. at 373. The assistant principle also had a report confirming student S and student M's were friends, and were part of an "unusually rowdy crowd" associated with alcohol use. *Id*. The Supreme Court concluded that student M's statement that the pills came from student S was "sufficiently plausible to warrant suspicion that [student S] was involved in pill distribution." *Id.* Further, the Supreme Court found that the assistant principal's suspicion was enough to justify a search of the backpack and outer clothing. *Id*.

Similarly, Sixth Circuit cases show that a reasonable level of investigation, observation, and assessment of the reliability of informants must take place before officials can search a student based on reasonable suspicion for drug use, and that the investigation in the case at hand fell short of the standard. In *Williams v. Ellington,* 936 F.2d 881 (6th Cir.1991), the plaintiff, a teenage girl, claimed that her high school violated her Fourth Amendment rights by strip searching her without reasonable suspicion as part of an investigation into allegations that she had been consuming drugs at the school. *Id.* at 882. A fellow student's parent first alerted the principal to the plaintiff's alleged drug use by claiming that she had witnessed the plaintiff and a friend smelling a white powder in class, and that the plaintiff had offered her some. *Id*. The principal verified that the accusing student had no animosity towards the plaintiff, ruling out any ulterior motives of the accuser, and then launched a multi-day investigation of the plaintiff. *Id*. He approached several of the plaintiff's teachers, who corroborated her strange behavior and reported a note that the plaintiff wrote in which she referred to drug use. *Id*. The principal also collected information from the school's guidance counselor, the plaintiff's aunt, and the friend's

father, all of whom expressed concern that both students may have been taking drugs. *Id.* The principal acted only when the student who first made the allegation again approached him and complained for the second time that the plaintiff and her friend were once again ingesting drugs in class. *Id.* at 883. Upon confrontation in the principal's office, the friend produced a vial of "rush." *Id*. Only then did the principal search the plaintiff. *Id*. The Sixth Circuit held that the search was justified at its inception. *Id*. at 886.

In *Fewless ex rel. Fewless v. Bd. of Educ. of Wayland Union Sch.*, 208 F. Supp. 2d 806 (W.D. Mich. 2002), the Court relied upon *Williams v. Ellington* to hold that the Assistant principal of a high school and the high school security officer did not have the requisite reasonable suspicion to search for marijuana on the student's person because the school had not pursued a reasonable investigation under the circumstances. In that case, the only basis for the search was statements by two fellow students that the student kept marijuana in his "butt crack." *Id*. at 810. The school did not pursue any further investigation of the circumstances, thus failing to uncover evidence, for instance, that the students who had accused plaintiff of possession were hostile toward the plaintiff. *Id.* at 819-820. The *Fewless* Court noted that it was significant that the *William's* Court "examined to what extent an informant's tip could be used to create reasonable suspicion. In analyzing the tip of an informant, a court is to use a 'totality-of-the-circumstances' inquiry and take into account the quantity and quality of the information comprising a tip." *Id.* at 818.

When this Circuit and others have found reasonable suspicion justifying a search of a student suspected of marijuana use, they relied on the observation of multiple, common indicia of marijuana smoking, none of which were present in this case. In *Widener v. Frye,* 809 F.Supp. 35, 38 (S.D.Ohio 1992), the Court found reasonable suspicion to search a student for marijuana

use when school officials personally observed multiple indicia of marijuana use in the student. The student smelled of marijuana, appeared "lethargic" and "sluggish," had dilated pupils in a manner consistent with marijuana use, and gave an unsatisfactory explanation for those factors. Notably, three separate school officials detected the odor of marijuana on the student, one of whom was a former detective for the local police department police. *Id.*; *See also Hedges v. Musco*, 204 F.3d 109 (3d. Cir. 2000) (finding reasonable suspicion to test for marijuana use when student behaved in "uncharacteristically gregarious manner;" her face was flushed; her eyes were glassy and red; her pupils were dilated; and she asked to get a drink of water, but proceeded in a direction away from the fountain and did not return for ten minutes. The school did not suggest a urinalysis, however, until the student was examined by the school nurse to check her vital signs); *Bridgeman v. New Trier High School Dist. No. 203*, 128 F.3d 1146 (7th Cir. 1997) (finding reasonable suspicion to test for marijuana use when student behaved in an unruly and inappropriate manner; had bloodshot eyes and dilated pupils; and school nurse confirmed higher than normal blood pressure and pulse).

In the case *sub judice*, Smith did not have sufficient information under the circumstances to justify a search as reasonable. First, Smith did not conduct a sufficient investigation to assess the reliability of Kabealo's and CP's account of JT's statement, nor did Smith collect any other information to support their accusation. For example, Smith did not consider the location in the classroom of CP and Kabealo in relation to JT at the time of the alleged statement, or how such a location could have affected the reliability of the statement. Smith did not speak to any other students besides CP who had been sitting with JT that morning to confirm the statement. By his own admission, Smith did not believe JT had any reputation for drug use, and he did not investigate JT's reputation for drug use with any other teachers or administrators. Unlike the

investigation that the school administrators pursued in *Safford* and *Williams*, in which they verified the reliability of the tip, and underwent an investigation, in which they spent considerable time, even days, connecting accused students to potential drug use or possession, Smith tested JT within minutes of first hearing the accusation against him. Further, this case does not present a situation like in *T.L.O.*, where school officials directly observed a student engaging in drug use or elicit activity, and which warranted less investigation.

Second, contrary to the other cases which found reasonable suspicion to drug test a student based on observation of multiple indicia of marijuana use, in this case Smith did not observe or consider any indicia of marijuana use in JT. Smith states that he did not consider JT's appearance or behavior to assess whether he appeared under the influence of marijuana, and nowhere in his testimony does he note that JT appeared to be under the influence or presented any other signs of having smoked marijuana, even though it is undisputed that JT was accused of smoking that morning and it was less than an hour into the school day. Neither did Kabealo nor any other school authority with whom JT came into contact note any evidence of marijuana smoking. As opposed to *Musco* and *Bridgman*, Nurse Gould did not, nor was she asked to perform any medical examination to identify internal symptoms of drug use. While all indicia need not be present, it was unreasonable not to consider that JT did not in any way appear to be under the influence when Smith made the decision not to investigate the matter further, and instead moved rapidly to a Fourth Amendment search.

Based on Smith's deposition testimony, when making the decision to drug test JT under threat of expulsion, he relied fully on Kabealo's statement and the corroboration of that statement by only one of many students present in the classroom at the time of JT's alleged statement. Smith does state that he trusted Kabealo and that he did not have any knowledge of

CP having any malice toward JT, though he does not state that he asked CP any question but whether JT made the statement of which he was accused. Further, no investigation was done into whether Kabealo's observations were reliable under the circumstances of an allegedly rowdy classroom and a distance of at least 15-20 feet from JT. Considering the incident took place on national marijuana day, when JT states many other students in the classroom were casually discussing national marijuana day, a reasonable administrator under the circumstances could have considered that some misunderstanding could have occurred, which called for pause and a further investigation.

Thus, under qualified the immunity analysis, taking the facts in light most favorable to Plaintiffs, Smith did not have reasonable suspicion to drug test JT, and thus there was a violation of his constitutional right against unreasonable search and seizure. Consequently, the first prong of the qualified immunity analysis has been satisfied.

### b. Steps 2 and 3 of the Qualified Immunity Analysis for Individuals: Whether the right was clearly established such that a reasonable official would have known about it

The Court has already determined that a constitutional violation occurred. The next step, then, in the qualified immunity analysis for individual school officials sued in their personal capacity is whether the right was clearly established such that a reasonable official would have known about it. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

In the context of school search and seizure, the Supreme Court in *Safford* set forth the standard for a clearly established law:

> A school official searching a student is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment. To be established clearly, however, there is no need that the very action in question [have] previously been held unlawful. The unconstitutionality of outrageous conduct obviously will be unconstitutional, this being the reason, as

23

> Judge Posner has said, that the easiest cases don't even arise. But even as to action less than an outrage, officials can still be on notice that their conduct violates established law ... in novel factual circumstances.

*Safford Unified Sch. Dist. No. 1,* 557 U.S. at 377-78 (internal citations and quotations omitted).

At the time of the search at issue, the prior law of the Supreme Court and this Circuit involving searches of students for suspected drug use and possession all clearly establish that Smith's determination that JT should be subjected to a drug test was unconstitutional. A reasonable principal should have known that students have a Fourth Amendment right against unreasonable searches and seizures, and that the standard for a reasonable search of students is reasonable suspicion. *T.L.O.* 469 U.S. at 336–37; *Tarter,* 742 F.2d at 981("[i]t is beyond peradventure that school children do not shed their constitutional rights at the school house gate. . . . School officials . . . are agents of the government and are constrained by the Fourth Amendment.")

The Supreme Court standard for free and voluntary consent to a search under the Fourth Amendment is also well-established. Further, the Supreme Court cases *T.L.O.* and *Safford*, as well as the Sixth Circuit case *Williams*, and the District Court case *Fewless*, puts Smith on notice as to the indicia of drug use and possession that should be considered in an investigation for and determination of reasonable suspicion of drug use. While it is unfortunate that Smith may have acted in conformity with a school policy to which he was bound, as will be discussed in the following section, such a school policy is unconstitutional and provides no protection to Smith in the individualized qualified immunity analysis. Thus, this Court concludes that it was objectively legally unreasonable for Smith to believe that JT and his mother gave voluntary and free consent to a urinalysis, and unreasonable for him to believe that his investigation into JT's alleged drug use met the well-established standard of reasonable suspicion under the circumstances.

As the Sixth Circuit has explained, "[l]ike police officers, school officials need discretionary authority to function with great efficiency and speed in certain situations, so long as these decisions are consistent with certain constitutional safeguards." *Williams by Williams*, 936 F.2d at 886. While questioning "an official's every decision with the benefit of hindsight would undermine the authority necessary to ensure the safety and order of our schools," coercing a student under threat of expulsion to take a drug test without establishing reasonable suspicion under the circumstances is akin to a student shedding his or her constitutional rights at the school gate. *Id.*

Accordingly, the Court does not find that qualified immunity precludes personal liability for Smith. The other school official Defendants sued in their individual capacities who played some role in the April 20, 2012 events at issue in this case, including Gould and Kabealo, were not sufficiently involved in the decision to test JT to be considered liable for a deprivation of JT's Fourth Amendment right.

### c. Municipal Liability: Custom or Policy Caused the Deprivation

Now that the Court has conducted the qualified immunity analysis for officials sued in their personal capacities, the Court will look to those sued in their official capacities, and, more specifically, to the municipal entity, the Academy.  The Court looks primarily to the Academy because official capacity suits generally represent another way of pleading an action against an entity of which an officer is an agent.  *Kentucky v. Graham,* 473 U.S. 159, 165 (1985). As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. *Id.* at 166. Since Smith was the only school official responsible for the decision to test JT, he is the only school official that the Court will consider in this analysis. Further, the superintendent H. David

McIIrath, who supervised Smith, and Patriot Preparatory Academy, the municipal entity itself, are also subject to this analysis.

This Court will now address the second prong of the qualified immunity analysis for officials sued in their official capacity and municipal entities: whether JT's constitutional injury was incurred because of the execution of an official policy or custom. *See Doe v. Claiborne County,* 103 F.3d 495 (6th Cir.1996) (citation omitted).  "Policy" has been defined as "formal rules of understanding—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480–81 (1986).

In *Fewless*, the Court considered whether defendants sued in their official capacities should be held liable for an unconstitutional search of a student. *Fewless*, 208 F.Supp.2d at 820-22. The *Fewless* Court determined that although the school officials who searched the student plaintiff were liable in their individual capacities for an unconstitutional search and seizure, the school board's policy concerning search and seizure was in no way unconstitutional, and there was no other evidence of official custom or policy concerning the violation. *Id.* at 822. In *Fewless* the official school policy concerning search and seizure "direct[ed] that no student be searched without reasonable suspicion or in an unreasonable manner. The extent of the search will be governed by the seriousness of the alleged infraction, the student's age, and the student's disciplinary history." *Id.* As the school policy met the constitutional "reasonable suspicion" standard, the *Fewless* Court held that the Plaintiff was not entitled to summary judgment as to any of the Defendants sued only in their official capacities.

In contrast to the school's policy in *Fewless*, the Academy policy concerning search and seizure is patently unconstitutional. The written expulsion policy in the student handbook concerning drug testing of students states:

> Expulsion: A student may be expelled because of excessive detention penalties or for other serious problems. For example, a student may be expelled if involved in the following, at or away from school, year round . . . Drug Testing: the school has the right to demand a drug test (at the parent's expense) if rumors are circulating about a particular student. The refusal to submit to a drug test at the request of the administration automatically results in the student's removal from the school.

The standard for a constitutional search of a student is reasonable suspicion under the circumstances.  A school policy that allows for drug testing under threat of expulsion based on rumors alone, regardless of any other circumstances, and without any other considerations or investigations, falls far short of the constitutional standard. Smith cited to this school policy in an email to Plaintiff's counsel as a justification for demanding JT's drug test. Further, in his Deposition, Smith states that he directly relied on this policy when making his decision to test JT. Smith's limited investigation into JT's alleged comments, and Smith's own statement that he relied only on the statements of Kabealo and CP when making his decision to test JT, also show that Smith acted pursuant to this official, unconstitutional policy. Thus, this written school policy can be said to have "caused" the violation of JT's Fourth Amendment right, and Defendants Smith and McIIrath, sued in their official capacities, and municipal Defendant Academy are not entitled to summary judgment on the basis of qualified immunity.

In sum, none of the Defendants considered by this Court in the qualified immunity analysis, including Smith, McIIrath, and the Academy, is entitled to qualified immunity; Gould and Kabealo are exempt from the analysis. Further, this Court has

found that whether JT made the alleged statement is a material disputed fact that precludes summary judgment, and, in the alternative, even when viewing the facts in the light most favorable to Defendants, Smith subjected JT to an unconstitutional search. Accordingly, Defendants' Motion for Summary Judgment as to Count I, violation of the Fourth Amendment under 42 U.S.C. §1983, is **DENIED**.

### B. 42 U.S.C. § 1983, Civil Conspiracy Claims

Defendants, in their Motion, contend that they are entitled to summary judgment on Defendants civil conspiracy claim because: (1) the Plaintiffs did not plead the claim with sufficient specificity; (2) all admissible evidence in this case demonstrates that Defendants all played separate and discreet roles and did not advocate, confer or agree about any courses of action regarding the decision to subject JT to a drug test; and (3) Defendants civil conspiracy claim is barred by the intra-corporate conspiracy doctrine.

An action for civil conspiracy may be brought under 42 U.S.C. § 1983 when parties conspire to deprive the plaintiff of his federal statutory or constitutional rights. *Adickes v. Kress & Co.,* 398 U.S. 144 (1970) (allowing such a claim to proceed beyond the summary judge stage). A civil conspiracy is an agreement by two or more persons to injure another by unlawful action. *Hooks v. Hooks,* 771 F.2d 935, 943–44 (6th Cir.1985). To find the existence of a civil conspiracy, it is not necessary to show express agreement among all the conspirators, nor is it necessary to show that each conspirator knew all of the details of the illegal plan or all of the participants involved. *Id.* Thus, to sustain a § 1983 conspiracy claim, the plaintiff must show: (1) that there was a single plan; (2) that the alleged co-conspirator shared in the general conspiratorial objective; and (3) that an overt act was committed in furtherance of the conspiracy that caused injury to the plaintiff. *Id.* at 944.

The Court finds that the Defendants have failed to set forth evidence sufficient to show a material fact in dispute as to their claim that the Defendants were engaged in a conspiracy to deprive JT of his Fourth Amendment rights. Although Plaintiffs have shown a violation of JT's constitutional rights, Plaintiffs fail to present facts to meet the standard for a conspiracy under § 1983. As Plaintiffs note, Smith certainly relied on the statements of Kabealo and CP when he made the decision to search JT in contravention of his Fourth Amendment right. Additionally, Smith certainly relied on Gould's assistance to perform the search. These facts fail to show, however, a material disputed fact concerning the existence of a shared single plan to search JT in contravention of his Fourth Amendment rights, or Defendants' alleged shared objective to search JT in contravention of his Fourth Amendment rights. The facts presented by Plaintiffs merely show that Smith relied on the assistance of others when making his independent, discretionary decision to search JT.

Since the Plaintiffs have not presented sufficient evidence to support their claim for Civil Conspiracy, the Court **GRANTS** summary judgment in favor of all of the Defendants on the Plaintiffs' claim of civil conspiracy.

### C. Negligent Misidentification

Defendants argue that they are entitled to summary judgment on Plaintiffs' claim of tortious misidentification. First, Defendants argue that state qualified immunity under O.R.C. § 2744.03 shields both Defendant Academy and individual school officials from liability. Defendants argue specifically that Plaintiffs cannot and do not present a triable issue with respect to conduct that would defeat political subdivision/employee/agent immunity pursuant to O.R.C. 2744.03(A), such as evidence that any Defendant acted outside of the scope of employment or with malicious purpose.

Plaintiffs retort that Defendants raised no facts to support their claim that they are entitled to state law immunity on Plaintiffs' negligent misidentification claim, thus relieving Plaintiffs of their burden to raise a triable issue in its response. Thus, Plaintiffs argue that Defendants' motion should fail.

To make a claim for the tort of negligent identification, or misidentification, Plaintiffs must show that a person was negligently improperly identified as being responsible for committing a violation of law, and suffered injury as a result of the wrongful identification. *Wigfall v. Society Natl. Bank* (1995), 107 Ohio App.3d 667, 669 N.E.2d 313. Plaintiffs must also show "a duty, a breach of that duty, proximate cause and injury before the person improperly identified for committing a crime can establish a valid claim." *Id.* at 673; *see* also *Barilla v. Patella*, 144 Ohio App. 3d 524, 534 (2001).

The Court need not apply the law of negligent identification to the case *sub judice* as state law immunity attaches to each Defendant implicated in this claim. O.R.C. § 2744.03(A)(3), relating to qualified immunity for political subdivisions, states in relevant part:

> The political subdivision is immune from liability if the action or failure to act by the employee involved that gave rise to the claim of liability was within the discretion of the employee with respect to policy-making, planning, or enforcement powers by virtue of the duties and responsibilities of the office or position of the employee.

O.R.C. § 2744.03(A)(6)(a) and 2744.03(A)(6)(b), concerning qualified immunity for state employees, states in relevant part:

> "the [political subdivision] employee is immune from liability unless one of the following applies: (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner."

Under O.R.C. § 2744.03(A)(6), Defendants sufficiently raised their sovereign immunity claim on behalf of individual school employees by stating that the actions school employee Defendants took that led to the false identification of JT as someone who had smoked marijuana: (1) took place within the scope of their official responsibilities; and (2) were without malice, bad faith, wantonness or recklessness. Once Defendants made the claim that there were no facts showing Defendants actions identifying JT as one who smoked marijuana were outside of the scope of their employment, or made maliciously, then the burden shifted to Plaintiffs to raise a material fact putting those assertions in dispute.

This Court determines that Kabealo's, Smith's and Gould's actions, as they pertain to the negligent misidentification claim, were well within the scope of their employment and official responsibilities: it was within the scope of Kabealo's responsibilities to report to the school principal what he thought was a statement by a student that he had smoked marijuana; it was within the scope of Smith's duties to determine whether a student should be tested for suspected drug use; and, it was within Gould's scope of employment to administer a drug test to students. Further, the evidence Plaintiffs presented to this Court does not include any claim that any of the three Defendants potentially involved in the claim of negligent identification harbored malice toward JT, or made in bad faith the incorrect conclusion that he was under the influence of marijuana.

Lastly, Defendant Academy is shielded from any liability under O.R.C. § 2744.03(A)(3), because all of Defendants' actions which gave rise to the negligent misidentification claim were within the discretion of the Defendants' individual enforcement powers under the duties and responsibilities of their position. Indeed, Smith, though he acted pursuant to a school policy when he decided to test JT, had final discretion in whether to administer a drug test; Gould was

tasked with enforcing school health protocol and interpreting the test; and Kabealo was tasked with enforcing school rules.

Thus, Defendants Motion for Summary Judgment is **GRANTED** in regards to Count V, Tortious Misconduct: Negligent Misidentification.

### D. Spoliation of Evidence

Defendants argue that they are entitled to summary judgment on Plaintiffs' Spoliation of Evidence claim. First, Defendants argue that the complaint itself does not state which Defendants destroyed or failed to maintain the evidence, nor does the complaint identify which evidence was destroyed. Plaintiffs retort—still without identifying which Defendants are targeted in this claim or which evidence was allegedly destroyed—that under *Celotex Corp. v. Catrett* the burden is on the Defendants to identify those portions of the materials in the record that demonstrate the absence of a genuine issue of material fact.

While Plaintiffs correctly cite to the holding in *Celotex*, they misapply that holding to the case *sub judice*. Defendants met their initial burden of showing no genuine issue of material fact by pointing out that in the complaint, Plaintiffs did not identify who destroyed evidence, or what evidence was destroyed. Then, in their Opposition Motion, Plaintiffs still do not identify what evidence was destroyed and by whom. Neither do Plaintiffs state in the fact section of their Opposition Motion that Defendants destroyed any evidence. Without these essential elements of the spoliation claim, there is no genuine issue of material fact. Thus, on this ground alone, Defendants are entitled to summary judgment on Plaintiffs' spoliation claim.

It is only by going beyond the pleadings and searching the Plaintiffs' depositions that the Court can conclude that the Plaintiffs refer to Defendants' failure to provide Plaintiffs with the

urine screen kit administered to JT on April 20, 2012. Defendants make the same assumption in their Motion.

Defendants argue that insofar as the claim relates to the destroyed urine test, there is no genuine issue of material fact regarding Plaintiffs' claim of spoliation of evidence, and Defendants are entitled to summary judgment as a matter of law. In Ohio, spoliation of evidence is recognized as an independent tort cause of action. The elements for the cause of action are as follows:

> (1) there is a pending or probable litigation involving the plaintiff; (2) knowledge on the part of the defendant that the litigation exists or is probable; (3) willful destruction of the evidence by the defendant designed to disrupt the plaintiff's case; (4) disruption of the plaintiff's case; and (5) damages proximately caused by the defendant's actions. A claim for spoliation of evidence may be brought at the same time as the primary action.

*In re Smartalk Teleservices, Inc. Sec. Litig.*, 487 F. Supp. 2d 947, 949 (S.D. Ohio 2007) (*citing Smith v. Howard Johnson Co., Inc.,* 67 Ohio St.3d 28, 29, 615 N.E.2d 1037 (1993)).

In the case *sub judice*, the urine screen is relevant only insofar as it assists Plaintiffs in their Fourth Amendment and Civil Conspiracy federal law claims, and state claim for negligent misidentification. This Court has already determined that Plaintiffs have shown a violation of JT's constitutional rights, and that determination did not depend in any way on the actual results shown by the urine screen. As the urine screen pertains to the claim of negligent misidentification, this court has already held that Plaintiffs' claim fails because Defendants are shielded from the negligent misidentification claim by state qualified immunity. Accordingly, Plaintiffs cannot show any disruption of their case from the alleged spoliation of evidence.

Plaintiffs also argue that Defendants erroneously apply Ohio law to the spoliation claim, since the Sixth Circuit recently held in *Adkins* that Federal law, not state, law applies to

spoliation of evidence sanctions. *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009) (holding federal, not state law, governs discovery sanctions for spoliation of evidence because: (1) the authority to impose sanctions for spoliated evidence arises not from substantive law but, rather, "from a court's inherent power to control the judicial process;" and (2) "a spoliation ruling is evidentiary in nature and federal courts generally apply their own evidentiary rules in both federal question and diversity matters"). Plaintiffs misread the Sixth Circuit holding in *Adkins*. While federal law does indeed govern sanctions as they pertain to trial and discovery after *Adkins*, there is no independent federal cause of action, or "substantive law," for spoliation of evidence.

Thus, there is no genuine issue of material fact as to Plaintiffs' spoliation claim, as Plaintiffs do not present any material disputed facts, and, even if they had, any alleged destruction of the urine screen administered to JT on April 20, 2012 does not disrupt Plaintiffs' ability to try its case. Accordingly, Defendants' request for summary judgment on Count II of the Complaint, Interference with and/or Destruction of Evidence, is hereby **GRANTED.**

### *E. Defamation*

Defendants argue that they are entitled to Summary Judgment as to Plaintiffs' state law defamation claim, which alleges that "Defendants, any one or more of them, falsely stated that JT did or said he did smoke and/or otherwise possessed marijuana," that this statement "reflects adversely on his character which will hold him in contempt or injure him in his trade or profession," and "were made without privilege and within the range of third parties." First, Defendants argue that in their complaint, Plaintiffs do not identify which specific Defendants made defamatory statements concerning JT. Defendants state that to the extent that Plaintiffs were referring to Defendant Kabealo's and CP's statement to Defendant Smith concerning JT's

alleged statement, Defendants argue that there is no genuine issue of material fact regarding whether Defendants are entitled to qualified immunity under O.R.C. § 2744.

Plaintiffs argue that the following material facts in dispute preclude summary judgment on their defamation claims: (1) whether Kabealo heard JT say he smoked marijuana; (2) Smith and Gould's statement of a positive test; and (3) whether Smith made a statement to CP within earshot of other students that JT was expelled for smoking marijuana.

Under Ohio law, the elements of a defamation claim, whether libel or slander, are "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Akron–Canton Waste Oil, Inc. v. Safety–Kleen Oil Serv., Inc.,* 81 Ohio App.3d 591 (Ohio Ct.App.1992) (internal quotation marks omitted). To survive a motion for summary judgment in a defamation action, the plaintiff must make a sufficient showing of the existence of every element essential to his or her case. *Daubenmire v. Sommers,* 2004-Ohio-914, ¶ 79.

Defendant Academy is shielded from the defamation claim under O.R.C. § 2744.03(A)(3), concerning qualified immunity for political subdivisions. Similarly, Defendants Smith and Kabealo are shielded from the defamation claim under O.R.C. § 2744.03(A)(6)(a)-(b), concerning qualified immunity for state employees.

### *1. Kabealo's Statement to Smith*

First, Kabealo is shielded by state sovereign immunity for any potential defamation claim against him concerning his statement to Defendant Smith. Such statement was clearly within the scope of his duties to report to the principal any student behavior that he deemed suspect.

Additionally, the evidence before this court does not show any indication that Kabealo harbored any malicious intent toward JT in reporting what he believed was a statement concerning JT's drug use. Thus, Kabealo is entitled to state qualified immunity for his statement to Smith that he heard JT say that JT had smoked marijuana.

### 2. Defendant Smith and Gould's statement

Similarly, the evidence before the Court shows no disputed facts undermining Gould and Smith's assertions that both were acting within the scope of their employment and neither was acting with malice when they made the incorrect conclusion about JT's drug test. It was clearly within the scope of both Smith's and Gould's employment to administer a drug test for a student suspected of drug use. The fact that they may have done so improperly is not relevant to this analysis. Additionally, the evidence before this Court, and the circumstances regarding the alleged statements, do not show any indication that Smith of Gould were motivated by malice or bad faith when they reported what they believed was a positive drug screen. Thus, both Defendant Smith's and Gould's statements are shielded by state sovereign immunity from any potential liability.

### 3. Smith's statement to CP

Finally, Plaintiffs state that there is a genuine issue of material fact concerning whether Smith made a statement to CP within earshot of other students that JT was expelled for smoking marijuana. Plaintiffs, however, do not sufficiently state facts to raise this claim. Plaintiffs do not provide any explanation of the context of this alleged statement; they do not state when it was made, why it was made, or who, if anyone, actually heard it besides CP.

Further, CP played a part in Smith's initial investigation; thus, it was not manifestly outside the scope of Smith's duties to tell CP the result of the investigation. Neither is there any

evidence before this Court showing that Smith made such a statement out of malice or in bad faith. At the time in question, Smith believed that JT had been suspended for a positive drug test, and so relaying such information to CP assumedly was not made in bad faith, but out of a reasonable belief, without any facts presented to show otherwise. Thus, Defendant Smith's alleged statements to CP are shielded by state sovereign immunity from any potential liability.

Accordingly, Defendants' request for summary judgment on Count III of the Complaint, Defamation, is hereby **GRANTED.**

### F. Filial Consortium

In their complaint, Plaintiffs raise the state law cause of action of loss of filial consortium. Under Ohio law, a loss of consortium claim is a derivative claim and is dependent upon a defendant committing a cognizable tort upon the parent of the child making the claim, or the child of the parent making the claim. *See Ward v. Cnty. of Cuyahoga*, 721 F. Supp. 2d 677, 695-96 (N.D. Ohio 2010) (tort committed upon the parent, with child making the filial consortium claim); *Wilson v. Columbus Bd. of Educ.,* 589 F.Supp.2d 952, 971–72 (S.D.Ohio 2008) (citing *Gallimore,* 67 Ohio St.3d 244, 617 N.E.2d 1052) (tort committed upon the child, with parent making the filial consortium claim). As the cause of action for filial consortium is a derivative claim dependent on a defendant committing a cognizable tort, and this Court has found in Defendants' favor in their Motion for Summary Judgment on all of Plaintiffs' state law tort claims, this Court **GRANTS** Summary Judgment to Defendants on Plaintiffs' filial consortium claim.

### G. Punitive Damages

Finally, Defendants request Summary Judgment on Plaintiffs' punitive damages claim. As this Court has found in Defendants' favor in their Motion for Summary Judgment on all of

Plaintiffs' state law claims, this Court need not address Plaintiffs' claim for punitive damages as to any state law claims.

In terms of Plaintiffs' federal claim, the only claim which survives Summary Judgment upon which punitive damages could be based are the claims against Smith, McIIrath and the Academy for a violation of JT's Fourth Amendment right under § 1983. Punitive damages may be awarded in a § 1983 action when a defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. *Wilson v. Columbus Bd. of Educ.,* 589 F. Supp. 2d 952, 973 (S.D. Ohio 2008) (Marbley, J.) *(citing Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)).

The same factual issues in dispute under the Fourth Amendment reasonable suspicion analysis are in dispute here. There is a genuine dispute as to whether the Defendant Smith had reasonable suspicion to search JT, and thus a genuine dispute as to whether the search of JT involved callous indifference to his federally protected constitutional right against unreasonable search and seizure. Further, in the alternative, this Court has stated that even when viewing the facts in the light most favorable to Defendants, Smith did not have reasonable suspicion to search JT under the circumstances; accordingly, a reasonably jury could find that Smith's actions were callously indifferent to JT's clearly established constitutional right. Thus, the Court **DENIES** Defendants' motion with respect to the punitive damages claim.

### IV. CONCLUSION

Based on the foregoing, the Court finds Defendants' Motion for Summary Judgment is **DENIED** as to Count I, Plaintiffs' Fourth Amendment claim under 42 U.S.C § 1983, and Count VII, Punitive Damages as to Plaintiffs' Fourth Amendment claim under 42 U.S.C. § 1983.

Defendants' Motion for Summary Judgment is **GRANTED** as to all other Counts in the Complaint.

**IT IS SO ORDERED.**


                                       **s/Algenon L. Marbley**
                                     **ALGENON L. MARBLEY**
                                     **United States District Judge**


**DATED: February 9, 2015**